**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL. PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL No. 3026 <br><br> Master Docket No. 22 C 71 |
| This Document Relates To: | |
| KATINA KOETH, *Individually*, and as Mother and Next Friend of Joseph Koeth, <br><br> Plaintiff, <br><br> v. <br><br> MEAD JOHNSON & COMPANY, LLC*, et al.*, <br><br> Defendants. | No. 22 C 2017 <br><br> Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

This case is among hundreds pending in this court and consolidated by the Judicial Panel on Multidistrict Litigation ("JPML"), in which plaintiffs have alleged that infant formula manufactured by Defendants caused babies born prematurely to develop necrotizing enterocolitis ("NEC"), a life-threatening inflammatory intestinal disease. Plaintiff Katina Koeth filed this case on behalf of herself and her son Joseph Koeth against one of the formula manufacturers, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (together, "Mead"). Koeth, a Nevada citizen, sued Mead in state court in Cook County, Illinois, where Koeth believed Mead maintains its principal place of business. After Mead (a citizen of Indiana and Delaware) removed the case to federal court and successfully sought transfer to the District of Nevada, the case returned to this court for consolidated pretrial proceedings in MDL No. 3026. The case has now been selected for a bellwether trial. More than two years after its reassignment to this court, in the process of case-specific discovery, Koeth's lawyer learned from the testimony of an expert that Nevada doctors may have been negligent in treating Joseph's condition. Accordingly, Plaintiff seeks leave to amend her complaint to join them as defendants in this suit and—because doing

so would destroy complete diversity between the parties—remand the case to Nevada [73]. For the reasons discussed below, the court grants Plaintiff's motion for joinder and remands to the Circuit Court of Cook County, where the case was filed.

## BACKGROUND

Joseph Koeth was born prematurely at Summerlin Hospital Medical Center ("SHMC") in Las Vegas, Nevada on November 12, 2015. Ten days later, after having been fed Mead's baby formula, he was diagnosed as suffering from NEC. During an exploratory laparotomy and a subsequent "second-look" procedure that week, doctors removed most of his bowel, which had necrotized. Tragically, NEC caused devastating harm to Joseph's gut and brain, including cysts and "hollow sections of brain death" that have left him with permanent spastic cerebral palsy. These circumstances have wrought enormous emotional, physical, and financial harm on the Koeth family. (Mem. of Law in Supp. of Pl.'s Mot. for Leave to Am. Compl. & Remand (hereinafter "Mot. to Remand") [73] at 3–4.)

Since its inception, Plaintiff's suit has bounced back and forth between Illinois and Nevada. Koeth first sued Mead in the Circuit Court of Cook County, Illinois, on November 16, 2021. Mead promptly removed that case to this court [2] and moved to transfer the case to federal court in Nevada, where Joseph was born and was treated [7]. While that motion was pending, Plaintiff moved for remand [12], arguing that Mead's principal place of business was in Illinois and that the forum-defendant rule—found in 28 U.S.C. § 1441(b)(2)—barred it from removing the action to federal court. In late February 2022, Judge Lefkow of this court concluded that Mead's principal place of business is in Indiana; she therefore denied Plaintiff's motion and granted Defendant's, transferring the case to Nevada [30, 31]. Just two months later, however, the JPML returned the case to this court for consolidated pretrial proceedings as part of MDL No. 3026 [51].

In October 2022, the Plaintiff Leadership Committee ("PLC") chose Koeth's case along with three others as "Initial Bellwether Discovery Cases" to test the potential value of the common claims in the MDL; once selected, pretrial discovery and other proceedings continued for about a

year.  ([258] in 22-cv-71.)  The parties agreed that the bellwether plaintiffs would complete fact sheets—which the PLC characterized as essentially "replac[ing] interrogatories and requests for production as an agreed-upon document that the plaintiffs who are responding cannot make any objections to"—and Koeth did so.  ([289] in 22-cv-71 at 37:3–9; Defs.' Mem. in Opp. to Mot. for Leave to Amend Compl. & Remand (hereinafter "Mead Opp.") [77] at 2–3.)  Mead and the PLC subsequently negotiated the scope of further written discovery.  (*See* [289] in 22-cv-71 at 43:5–44:4; [300] in 22-cv-71.)  In response to Mead's requests, Koeth produced a plaintiff profile form, fact sheet, answers to interrogatories, and documents.  (Mot. to Remand at 3.)  During this time, Mead also twice moved to dismiss Koeth's claim in the winter of 2023, and Koeth twice amended her complaint in response.  (*See* Mots. to Dismiss [57, 64]; First & Second Am. Compl. [62, 66].)

Finally, on September 19, 2023, Mead deposed Katina Koeth (Mead Opp. at 3), and according to Plaintiff, an exchange during that deposition sparked an idea that ultimately prompted the present motion. (Mot. to Remand at 4.)  At the deposition, Plaintiff recounts, Mead's counsel asked Koeth some questions "suggesting that the child's cerebral palsy pre-existed his NEC."  (*Id.*)  This apparently surprised Stephen Reck, Plaintiff's attorney, whose "belief from . . . reading . . . Joey Koeth's medical records" was that it was NEC that caused the brain injury.  (Aff. of Stephen M. Reck, Ex. 2 to Mot. to Remand (hereinafter "Reck Aff.") [73-2] ¶ 6.)  He decided to contact a pediatric radiologist, who he felt "would likely be able to provide . . . an opinion on this causation issue."  (*Id.* ¶ 7.)

Plaintiff retained Dr. Stephen Henesch, a board-certified pediatric radiologist, and after obtaining "Joey's x-rays, films and scans" from SHMC, Plaintiff sent the baby's "relevant medical records and imaging" to Dr. Henesch on November 14, 2023.  (*Id.* ¶¶ 9–13; Aff. of Stephen M. Henesch, D.O., Ex. 3 to Mot. to Remand (hereinafter "Henesch Aff.") [73-3] ¶ 6.)  A week later, Dr. Henesch confirmed to Koeth's counsel that an "ultrasound of Joseph Koeth's brain was normal prior to the NEC and appeared catastrophic after," leading him to conclude that the NEC predated the brain injury.  (Henesch Aff. ¶ 7.)  Significantly, for purposes of this motion, Dr. Henesch's

3

conclusions did not end there; Dr. Henesch felt it "important" to state his belief that a radiologist at SHMC—Dr. Dianne Mazzu—had been negligent in failing to notice signs of Joseph's NEC appearing on an abdominal x-ray conducted early in the morning of November 21, 2015, a day before Joseph's condition was diagnosed. (*Id.* ¶¶ 7, 11, 14.) According to Dr. Henesch, the standard of care required the treating physician to recognize the signs of NEC on November 21 and to "immediately stop[] all feeds," begin treatment of the baby with antibiotics, and begin taking "serial abdominal x-rays." (*Id.* ¶ 10.) Instead, doctors increased the amount of formula Joseph was receiving from 108cc to 172cc for a 24-hour period. (*Id.* ¶ 12.) According to Henesch, 24 hours are "an eternity in untreated NEC," where "time is of the essence, in order to prevent the often rapid progression of NEC and all of its sequelae." (*Id.* ¶¶ 10, 12.) In fact, by the next morning, Joseph's x-ray showed "ominous" indications of significantly worsened NEC. (*Id.* ¶ 11.) The radiologist's negligent delay, Heschel concluded, "directly contributed to the worsening of Joseph Koeth's NEC, which lead [sic] to intestinal perforation, multiple intestinal surgeries and short-gut syndrome, as well as additional systemic abnormalities, including intracranial hemorrhage and cerebral palsy . . . ." (*Id.* ¶ 14.)

Confronted with this new information, Mr. Reck "was left with a weighty decision as to how to proceed." (Mot. to Remand at 5.) His options included filing a separate malpractice action against the medical providers in Nevada state court or seeking to join them as Defendants in this lawsuit. Mr. Reck's local counsel in Nevada had experience litigating malpractice claims against SHMC; those local attorneys expressed "the importance of bringing the medical malpractice and the products liability cases together . . . ." (Reck Aff. ¶ 19.) In part, this is because Nevada law allows defendants to point the finger at an "empty chair"—i.e., an alleged tortfeasor who is absent from the suit. (Mot. to Remand at 5.) Additionally, Reck was concerned that two different actions "for the same injuries"—one against Mead here and one against the medical providers in Nevada—would risk inefficiency and inconsistent verdicts. (*Id.*) As a result, Plaintiff now seeks to amend Ms. Koeth's complaint to add negligence actions against SHMC, Dr. Mazzu, and Desert

4

Radiology, LLC (hereinafter "Medical Defendants") stemming from providers' "fail[ure] to report signs of NEC in the abdominal x-ray, performed on November 21, 2015." (Third Am. Compl., Ex. 1 to Mot. to Remand [73-1] at 41–59.)

**DISCUSSION**

Several principles are at play in this motion. First, even after the time when a party may amend its pleading as a matter of course, the court "should freely give leave [to do so] when justice so requires." FED. R. CIV. P. 15(a)(2). Second, multiple defendants may be joined in a single lawsuit so long as "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." FED. R. CIV. P. 20(a)(2). Finally, when, after a case has been removed to federal court on the basis of diversity, a plaintiff "seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State Court." 28 U.S.C. § 1447(e). Defendants argue that allowing Plaintiff to amend and join the Hospital Defendants at this late stage is improper for two main reasons. First, they argue that joinder of the Medical Defendants is improper under Rule 20's standard for permissive joinder. Second, they argue that this court should retain jurisdiction of the case—and to do so, should deny Plaintiff's motion because joinder of Nevada-based Medical Defendants would deprive the court of subject matter jurisdiction over Plaintiff's suit.

**I.      Joinder Under Rule 20**

To determine whether a claim arises out of the same transaction or occurrence, courts "should 'consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds.'" *Estee Lauder Cosms. Ltd. v. P'ships & Unincorporated Assocs. Identified on Schedule A*, 334 F.R.D. 182, 185 (N.D. Ill. 2020) (quoting *Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007)). Typically, this involves determining whether there is a "logical relationship between the separate

causes of action," illustrated in a "substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant." *Id.* (quoting *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012)).

Courts "differ drastically" in determining when joinder is proper under Rule 20. *Papachristos v. Hilton Mgmt., LLC*, No. 14 CV 5501, 2015 WL 1094852, at *2 (N.D. Ill. Mar. 10, 2015) (quoting *Hughes v. Sears, Roebuck & Co.*, No. CIV.A. 2:09-CV-93, 2009 WL 2877424, at *3 (N.D.W. Va. Sept. 3, 2009)). As a result, both sides here are able to cite cases that support their positions—that is, cases in which judges granted or denied requests to join groups of defendants in circumstances like those in this case. Koeth, for example, points to *Schulke v. Stryker Orthopaedics*, No. 16 C 2563, 2016 U.S. Dist. LEXIS 70455, at *3–7 (N.D. Ill. May 31, 2016), in which the plaintiff, whose hip replacement caused him pain and required subsequent corrective surgery, sued both the manufacturer of the implant's components and the doctors who performed the operation. Finding joinder proper under Rule 20, the court found the products liability and medical malpractice claims were "completely intertwined" because "all of Schulke's claims for relief arise out of his hip replacement and revision surgeries and the after-effects of those surgeries, allegedly as a result of medical negligence, product malfunction, or a combination of both." *Id.* at *4 (collecting cases with similar findings).

Contrarily, Mead points to a similar case, from an MDL involving the same company's allegedly defective hip implants, in which a plaintiff sought to join healthcare defendants for "failure to adequately monitor, diagnose, warn, and treat" her after a hip replacement surgery, alongside the implant manufacturer. *In re Stryker Rejuvenate & ABG II Hip Implant Prod. Liab. Litig.*, No. 23-899 (DWF/DJF), 2023 WL 6514996, at *1 (D. Minn. Oct. 5, 2023), *appeal dismissed,* No. 23-3364, 2023 WL 11156365 (8th Cir. Oct. 26, 2023). The manufacturer removed the case and

sought to sever the non-diverse healthcare providers as improperly joined.[1] *Id.* at *2. Applying Rule 20, the court sided with the manufacturer, finding no substantial evidentiary overlap between the two claims. The medical malpractice claim would require evidence concerning her care and treatment, while the products liability claim would require evidence about the manufacturing and design of the hip implant. *Id.* at *3. The court noted that "[a]ny liability that may be found against either [the manufacturer] or the [healthcare providers] would not be a basis for liability as to the other," and that "separate liability as to each could be found." *Id.* The court added that "because of the nature, stage, and progression of this MDL," severance of the medical defendants best served the interest of justice. *Id.*; *see also Smith v. Hendricks*, 140 F. Supp. 3d 66, 75 (D.D.C. 2015) (finding improper joinder of pelvic mesh manufacturer and healthcare providers who implanted it).

Mead points out that a substantial amount of evidence in Koeth's case—particularly as to liability—involves no overlap between the two groups of defendants. Mead claims that Plaintiff "misapprehends Mead Johnson's defense," which is that its "products simply do not cause NEC." (Mead Opp. at 12 n.6.) Thus, Mead urges, its potential liability is predicated on *causing* Joseph Koeth's NEC, while the Medical Defendants' liability is predicated on delay in *diagnosing* and improperly *treating* that NEC. Indeed, Mead points out that the only explicit mention of healthcare providers in its answer relates to the "learned intermediary" doctrine—that is, that Mead could only be liable for failing to warn doctors (so-called "learned intermediaries"), not patients. (*See* Answer to Compl. [8] at 61–62.)

Though Mead's arguments have merit, the court concludes that Plaintiff's claims against the Medical Defendants and Mead arise out of the same transaction or occurrence. Joseph

---

[1] Plaintiff attempts to distinguish *In re Stryker* on the grounds that it involved the fraudulent misjoinder doctrine, which does not apply in the Seventh Circuit. (*See* Pl.'s Reply to Defs.' Opp. to mot. for Leave to Amend Compl. And Remand to Nevada State Court (hereinafter "Pl.'s Reply") [78] at 1.) But this is irrelevant; to determine whether the parties had been improperly joined, the court applies Rule 20's transaction or occurrence test. *See In re Stryker*, 2023 WL 6514996, at *1.

Koeth's premature birth and development of NEC are at the heart of both claims. If a reasonable jury could find that Mead's product was a cause of NEC, delay in treatment or improper treatment may have made things worse—a matter relevant to the damages recoverable from Mead. Indeed, in its answer to Koeth's complaint, Mead claims that to the extent the "fault of other persons or entities for whom Mead Johnson is not responsible" caused Plaintiff's harm, then Mead is entitled to "apportionment of all such causal fault and a reduction of any award against it" (if not absolved altogether). (*Id.* at 62.) Not surprisingly, Mead's attorneys questioned Ms. Koeth during her deposition about the experience of the doctors who treated her. (Pl.'s Reply at 7 n.4 (Mead's counsel asked Koeth if it was her "understanding was that [doctors and nurses] knew or understood the risks and benefits of the nutrition available to Joey or for Joey?" and whether she suspected "that the nursing staff or the NICU staff were not properly trained in taking care of premature infants . . . .?").) It is reasonable to suspect such questions will be asked at trial, and thus reasonable to present evidence on the issue at a trial in which the medical-care providers themselves are parties.

      Mead is correct that the liability claims at issue fall into distinct categories (cause of NEC versus treatment of the condition), but the claims are intertwined with questions regarding the extent of Joseph's damages and the cause of specific manifestations of the disease. Thus, if a jury were to find that Mead's product caused Joseph's NEC, and that Dr. Mazzu was negligent, the jury might also need to assess the extent to which Dr. Mazzu's intervening negligence exacerbated his condition, causing cerebral palsy or other catastrophic injuries that otherwise would have been prevented. Understanding what caused the extent of Joseph Koeth's injuries thus involves inquiries into both (a) the development of Mead's formulas that allegedly created the underlying condition and (b) the treatment Joseph received at the hospital, not one or the other.

      The cases are thus related enough to fairly be said to arise out of the same transaction or occurrence. To view the case otherwise would mean "[s]o finely parsing" Koeth's allegations as

8

to "miss[] the critical point"—that both claims rest on the injuries Joseph suffered from NEC. *Schulke*, 2016 U.S. Dist. LEXIS 70455 at *4; *see also Papachristos v. Hilton Mgmt., LLC*, No.14 CV 5501, 2015 WL 1094852, at *1 (N.D. Ill. Mar. 10, 2015) (finding Rule 20 satisfied where plaintiff was injured in a fall at a hotel and then, after a car accident years later and while her suit against the hotel was pending, sought to join the driver as a defendant for exacerbating her years-old slip-and-fall injury).

The court concludes, therefore, that the parties *may* be joined, and turns now to the question of whether they *should* be joined at this stage of the litigation. *See* FED. R. CIV. P. 15(a); 28 U.S.C. § 1447(e).

## II.    28 U.S.C. § 1447(e)

"When joinder of a nondiverse party would destroy subject matter jurisdiction, 28 U.S.C. § 1447(e) applies and provides the district court two options: (1) deny joinder, or (2) permit joinder and remand the action to state court." *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752, 759 (7th Cir. 2009). District courts choosing between those two options look to four factors adopted by the Seventh Circuit in *Schur*: 1) the plaintiff's motive for seeking joinder; 2) the timeliness of plaintiff's request; 3) prejudice to the plaintiff if joinder is refused; and 4) "any other relevant equitable considerations." *Id.* Such decisions are left to the court's discretion. *Id.*

As a preliminary matter, there is no dispute that the addition of the Medical Defendants would deprive this court of subject matter jurisdiction. Federal district courts have original jurisdiction over civil actions between citizens of different states whose matter in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Mead properly removed this case to federal court on this basis. (*See* Min. Entry [30].) If Plaintiff's joinder motion is granted, however, the presence of the Medical Defendants, who are citizens of Nevada, would destroy complete diversity. (*See* Proposed Am. Compl. [73-1] ¶¶ 162–67 (noting Nevada citizenship of Medical Defendants)). Exercising supplemental jurisdiction over the Plaintiff's claims against the non-diverse Medical Defendants is not an option. *See* 28 U.S.C. 1367(b) (noting that in diversity actions, the court

may not exercise supplemental jurisdiction over claims brought by plaintiffs against parties joined pursuant to Rule 20). The court must thus decide whether to grant Plaintiff's joinder motion and remand the case or deny the motion and retain this case, adjudicating only Plaintiff's claims against Mead. Reasonable minds could differ on this issue, but as explained below, after considering the *Schur* factors, the court opts for joinder and remand.

### A. Motive

In assessing the Plaintiff's motive for seeking joinder, the court focuses "particularly [on] whether the purpose is to defeat federal jurisdiction . . . ." *Schur*, 577 F.3d at 759. Since "[i]t is difficult to assess a party's true motives in bringing new claims," *Dahl v. DeBriyn*, No. 23-CV-552-JDP, 2024 WL 415379, at *4 (W.D. Wis. Feb. 5, 2024), courts typically look to the underlying merits of the claims the plaintiff seeks to join. *Schur*, 577 F.3d at 763–64. The more viable the claim appears, the less likely its joinder was improperly motivated. The most relevant inquiry into a plaintiff's motivation for joining a nondiverse defendant is thus focused on "whether there is any reasonable possibility that the plaintiff could prevail against [them]." *Id.* at 764; *see also Ali v. Volkswagen Grp. of Am., Inc.*, No. 19-CV-06148, 2020 WL 5250669, at *3 (N.D. Ill. Sept. 3, 2020) (noting that "the Seventh Circuit has made clear" in *Schur* that an inquiry into the merits of plaintiff's claim against a nondiverse defendant is the "important question" to ask). Finally, other context clues can also reveal a plaintiff's motive to defeat jurisdiction, "[e]ven if a plaintiff's proposed claims against a non-diverse defendant are plainly viable . . . ." *Stuart v. Chin*, 835 F. Supp. 2d 680, 682 (S.D. Ind. 2011). For example, "[w]hen a plaintiff was aware at the time of the filing of her original complaint of the identity of the defendant she now seeks to add, there arises some suspicion of plaintiff's motives to amend." *In re Bridgestone/Firestone, Inc., ATX, ATX II*, 129 F. Supp. 2d 1202, 1205 (S.D. Ind. 2001).

Mead argues that from the beginning of the suit, Plaintiff manifested a desire to stay in state court by filing in Cook County, where it seemed—ultimately incorrectly—that Mead would be unable to remove the case. And, in Mead's view, it is not credible that Plaintiff only thought to

investigate the causation issue regarding Joseph's cerebral palsy some two years into the lawsuit. Finally, Mead points to two cases in which it alleges that the same attorney who represents Plaintiff here "dismiss[ed] similar NEC cases . . . for tactical reasons." (Pl.'s Reply at 9 (citing *Hunte v. Abbott Lab'ys, Inc.*, 556 F. Supp. 3d 70, 78 (D. Conn. 2021); Ord. on Mot. for Evidentiary Hearing Regarding Potentially Sanctionable Conduct, *Ferry v. Mead Johnson*, 3:20-cv-00099 (D. Conn. Mar. 30, 2022)).[2]

Mead's arguments have some force. A cynic could look at Plaintiff's actions and conclude that, after trying to file in Cook County and unexpectedly being removed to federal court, Plaintiff's counsel simply waited long enough that joining the doctors would arouse less suspicion, and then did so. But nothing in the record directly supports this notion. Plaintiff has filed an affidavit averring that the discovery of information relating to the possible role of the Medical Defendants in harming Joseph was a surprise. Though the circumstances may suggest the failure to pursue the Medical Defendants earlier was some sort of tactical maneuvering, the evidence is more consistent with a claim of oversight or omission on the part of Plaintiff's counsel.

More importantly, as Dr. Henesch's affidavit elucidates, Plaintiff's claims against the Medical Defendants do not appear to be frivolous. If Henesch's assessment is correct, the Medical Defendants could well be liable for a portion of the harm Joseph has suffered. Accordingly, "[a]ny suspicions" that Plaintiff's motion might have been designed to evade federal jurisdiction "will not outweigh his clearly legitimate motive of seeking liability from a potentially negligent party." *Darnell v. Hoelscher Inc.*, No. 09-CV-204-JPG, 2010 WL 3119425, at *3 (S.D. Ill. Aug. 4, 2010). This factor weighs in favor of joinder and remand.

---

[2] Plaintiff's counsel disputes what he calls Mead's "outlandish and unsupported" characterizations of the two cases in the District of Connecticut that were voluntarily dismissed, arguing that no judge found the decisions improper and there were independent reasons for dismissal. (Pl.'s Reply at 10.)

**B.     Timeliness**

To assess the timeliness of Plaintiff's request, the court examines any delay between counsel's learning of the grounds for seeking joinder of the Medical Defendants' joinder and acting on that knowledge.  Importantly, though "a two-year delay [may] appear[] untimely" when applying the *Schur* factors, the "context" can excuse that delay or militate in favor of remand.  *Ramos v. Urschel Lab'ys, Inc.*, No. 21 C 5131, 2023 WL 7220552, at *2 (N.D. Ill. Nov. 2, 2023).

In *Schur*, for example, the plaintiff's suit had been pending for over a year before her motion to amend, but the Seventh Circuit stressed that she had only discovered the proposed new defendants' role in the case two months before her joinder attempt.  *Schur*, 577 F.3d at 767.  On appeal from denial of the joinder motion and entry of judgment in favor of the originally-named defendant, the court found that the delay "actually *support*[ed] [Plaintiff's] position," in that "[h]ad Schur sought to join [the proposed defendants] immediately after removal, but without additional discovery providing a legitimate reason for doing so, it would have suggested that the joinder's only purpose was to destroy jurisdiction."  *Id.*  In *Ramos*, too, the plaintiff sought to join new defendants two years into the lawsuit, but the court likewise found no timeliness issue given that "Ramos moved to amend two months after learning of [the defendant's] possible role" in his harm.  *Ramos*, 2023 WL 7220552, at *2.

In this case, Plaintiff's motion was filed more than two years after initiation of the lawsuit—but that delay is less significant in context.  Plaintiff's counsel did not sit on evidence of medical negligence for two years before seeking joinder; rather, he only uncovered the grounds for joinder after Dr. Henesch independently raised the possibility of negligence on the part of the Medical Defendants while being asked to opine on a separate issue.  (*See* Reck Aff. ¶¶ 15–16.)  Mead disputes the truthfulness of this account, suggesting that a reasonable lawyer would have investigated Plaintiff's medical records and vetted possible claims against the Medical Defendants before suing in the first place.  (Mead Opp. at 10.)  As Mead notes, joining medical providers as defendants on negligence theories together with claims against the manufacturer of a defective

12

drug or other product is an obvious consideration in cases like these. Perhaps Plaintiff ought to have hired a medical expert before suing to review Joseph's x-rays and explore the possibility of malpractice. Indeed, when asked in her deposition why she did not sue SHMC, Ms. Koeth claimed that her attorney told her "that they did the standard of care for – after looking over all of [Joseph's] medical records." (Pl.'s Reply at 13 n.8 (quoting Sept. 19, 2023 Dep. of Katina Koeth).) Reck's affidavit implies that he had not in fact received the relevant radiology imaging before consulting with Dr. Henesch after her deposition. (Reck Aff. ¶¶ 9–11.) The court will assume that he did not investigate the matter in depth before filing the complaint. But the specificity of Plaintiff's allegations—that Dr. Mazzu failed to spot NEC a day early, which dramatically exacerbated Joseph's harm—suggests that the negligence theory undergirding this motion was not plain from the medical records. And due diligence does not require a plaintiff to conduct an expensive, full-scale investigation into a claim before filing suit. Accordingly, as in *Schur* and *Ramos*, the period most relevant to assessing Plaintiff's dilatoriness is the time between Dr. Henesch's discovery and Plaintiff's filing this motion.

That time is about four months. After learning of the Medical Defendants' possible involvement, in November 2023, Plaintiff filed this joinder motion on March 14, 2024. (*See* Mot. to Remand.) Plaintiff's counsel claims that he spent those months securing and conferring with Nevada counsel about the legal consequences of suing the Medical Defendants separately in state court; preparing Dr. Henesch's affidavit (which was completed about a month prior to this filing) to serve as the "Affidavit of Merit" that Nevada law requires before bringing a malpractice claim; and negotiating a retainer agreement with local counsel (completed the day of filing). (*Id.* at 15; *see also* Nevada Rev. Statutes 41A.071.) Given these circumstances, the four-month delay does not appear to be unreasonable. *See Schur*, 577 F.3d 767 (considering delay relevant as part of inquiry into plaintiff's motive for joinder). This factor thus also weighs, if slightly, in favor of joinder.

13

### C. Prejudice to Plaintiff

The third *Schur* factor asks this court to assess "whether the plaintiff will be significantly injured if joinder is not allowed . . . ." *Id.* at 759. The court agrees with Plaintiff that there is a risk of inconsistent verdicts and other prejudice if joinder is denied.

Nevada law allows the so-called "empty chair" defense, in which a defendant may point the finger at a non-party to deflect blame. (Mot. to Remand at 15–19; *see* NEVADA CIVIL JURY INSTRUCTION 9.19 (2018) (directing juries to assess comparative negligence of non-parties when returning verdicts); *see also Bhatia v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 134 Nev. 915, 417 P.3d 352 (2018).) Plaintiff rightly points out that in the federal trial, Mead could successfully argue that medical malpractice, not its baby formula, was to blame for the extent of Joseph's injuries (if not the sole cause), and in the Nevada trial, the Medical Defendants could convince a jury of the opposite. This could result at best in inconsistent verdicts and at worst in a denial of any remedy if both juries conclude that tortious conduct had occurred but place all the blame on the absent Defendants. *See Fontenot v. Johnson & Johnson*, No. 10-CV-162, 2012 WL 2064722, at *6 (W.D. La. Apr. 13, 2012), *report and recommendation adopted*, No. CIV.A. 10-00162, 2012 WL 2064848 (W.D. La. June 5, 2012) (noting the prejudice in plaintiffs having to "prosecute their causes of action against both sets of defendants . . . with two separate lawsuits in two separate forums," and that because Louisiana law allowed defendants to blame non-parties, "the possibility of inconsistent verdicts is very real"); *Devore v. C.R. Bard, Inc.*, No. CIV. A. 3:09-0640, 2009 WL 3856657, at *2 (S.D.W. Va. Nov. 12, 2009) (same).

Mead calls this argument "wholly unfounded" due to the lack of overlap between Plaintiff's theories of liability as to each proposed set of defendants, as well as the fact that neither defendant is an indispensable party to the suit. (Mead Opp. at 11–12.) In particular, Mead relies on *In re Bridgestone/Firestone*. In that case, a plaintiff's car tire malfunctioned and caused her to crash; she sued the car company and the tire manufacturer in California state court, and the defendants successfully removed to federal court. 129 F. Supp. 2d at 1203. A few months later,

she sought to name, as an additional defendant, the California dealer who sold her the car—a move that would defeat complete diversity and force remand, thus triggering § 1447(e). *Id.* at 1203–04. In denying plaintiff's motion, the court noted that "[u]nder California law, the absence of the dealer will not prevent complete relief from being secured by a Plaintiff as to those Defendants who have already been named in the case." *Id.* at 1206. The court went on to note that "any prejudice to Plaintiff from an 'empty chair' defense is likely to be slight, as [the plaintiff] herself implicitly admits by her failure to include the dealer in her original complaint." *Id.*

Here, it is true that the defendants' defenses do not have significant overlap, which lessens somewhat the fear of finger-pointing: Mead would claim that its formula does not cause NEC, and the Medical Defendants would claim that they treated NEC appropriately, whatever its cause. But this case is nonetheless more susceptible to finger-pointing than in *Bridgestone,* where both the manufacturer and the dealer were strictly liable for the plaintiff's injuries if the product were defective.[3] *See id.* at 1205. Moreover, the court did not see the "empty chair" problem as a genuine possibility in that case; the manufacturer was not defending on the basis that the dealer had somehow introduced the defect into the car, and the court had "great scepticism [sic] that the separation of a wheel was the kind of factual situation where such a defense is likely to succeed." *Id.* at 1206 (citing *Filippini v. Ford Motor Co.*, 110 F.R.D. 131, 135 (N.D. Ill. 1986)). To the contrary,

---

[3] Neither party here has expansively briefed the question of how Nevada law would apply in the various permutations of jury verdicts apportioning fault. But it appears to the court that the Medical Defendants would only be severally liable for apportioned harm, while products manufacturers like Mead are jointly and severally liable. *See* Nevada Rev. Statutes 41.141 (providing that parties may assert comparative negligence and be held severally liable, but explicitly noting that the statute "does not affect the joint and several liability, if any, of the defendants in an action based upon . . . [a]n injury to any person or property resulting from a product which is manufactured, distributed, sold or used in this State.") If the court understands Nevada law correctly, if a jury found Mead at fault to any degree, Plaintiff could collect 100% of the damages for Joseph's injuries from Mead, but could collect from the Medical Defendants only the percentage of damages for which a jury found them responsible. If this is correct, it mitigates but does not entirely eliminate the prejudice to plaintiff from litigating in separate fora: a federal court jury could determine that Mead's formula did not cause NEC (thus meaning no federal recovery) and a Nevada jury could conclude that Mead does bear some responsibility, and reduce the recovery available against the Medical Defendants accordingly.

here, the doctors are severally liable and have an obvious incentive to amplify Mead's role in causing the underlying NEC, while also arguing their treatment did not exacerbate its effects. Similarly, as discussed above, Mead not only has an incentive to argue that the hospital's negligence caused the brunt of Joseph's injuries, but has in fact hinted at such defenses in its deposition questioning and affirmative defenses.

The cases are not as cleanly separable as Mead suggests. Indeed, "denying joinder would result in two cases proceeding in separate court systems both seeking redress for injuries [P]laintiff alleges she suffered from exposure" to Mead's formula. *Harper v. Cent. Wire, Inc.*, No. 19 C 50287, 2022 WL 1102018, at *6 (N.D. Ill. Apr. 13, 2022). The court thus finds that disentangling Joseph's injuries and these sets of Defendants in two separate trials is somewhat impractical, difficult, and prejudicial to the Plaintiff.

### D. Balance of the Equities

Finally, the court must weigh "any other relevant equitable considerations." *Schur*, 577 F.3d at 759. Those might involve prejudice to the defendant, general efficiency, and anything else that counsels in favor of or against joinder and remand. These considerations weigh against joinder, but only slightly, and not enough to outweigh the factors justifying joinder and remand.

First, the purpose of diversity jurisdiction is to honor out-of-state defendants' interest in maintaining a federal forum. *See Darnell v. Hoelscher Inc.*, No. 09-CV-204-JPG, 2010 WL 3119425, at *4 (S.D. Ill. Aug. 4, 2010) (considering defendant's interest in avoiding biased state court when applying § 1447(e)). Joinder will deprive Mead of that interest. Moreover, Plaintiff's claim has become a bellwether case in an ongoing MDL. Joinder also deprives Mead of the benefits offered by the MDL and requires it to defend itself in an additional state forum. Indeed, courts recognize that "the economic benefits made possible by multidistrict litigation" counsel against remand. *In re Bridgestone/Firestone*, 129 F. Supp. 2d at 1207; *Haltner v. Am. Home Prod. Corp.*, No. CV-99-333-B, 1999 WL 969276, at *1 (D.N.H. Oct. 8, 1999) (expressing the

same). Finally, the fact that Plaintiff's claim has been selected for bellwether treatment means that Mead has paid additional attention to it, including by deposing Ms. Koeth.

Efficiency and burden concerns are somewhat mitigated in this case, however. For one, this is not the first time cases have left this MDL so that medical defendants could be joined. *See, e.g., In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prod. Liab. Litig.*, No. MDL 3026, 2022 WL 7501283, at *1 (N.D. Ill. Oct. 12, 2022) (remanding 29 cases from this MDL to Pennsylvania state court, where plaintiffs joined nondiverse hospital defendants). Moreover, though Mead deposed Ms. Koeth and received answers to her fact sheet and some additional interrogatories, little other discovery appears to have occurred (and what discovery has occurred will be of use whether the case is tried here or in Nevada state court). And while it is true that remand will disrupt to some extent the parties' "carefully negotiated pre-trial proceedings" and perhaps require the search for a replacement case for the bellwether pool (Mead Opp. at 11), Mead overstates how much these corrections would truly impact administration of the MDL.

Joinder at this stage will burden the MDL and Mead, but the burdens do not outweigh the default preference for allowing "[a] plaintiff . . . [to] choose its own forum"—particularly where, as here, the record does not betray a motive on the plaintiff's part to defeat federal jurisdiction. *Schur*, 577 F.3d at 763. The court concludes that, combined, the *Schur* factors weigh in favor of joining the Medical Defendants in this action and remanding the case. *See* 28 U.S.C. § 1447(e).

Plaintiffs have asked that the case be remanded directly to Nevada state court. Because the case was originally filed in the Circuit Court of Cook County, Illinois, however, the rule directs that the case be remanded to that court. *See* 28 U.S.C. § 1447(e) (noting that the court may "permit joinder and remand the action to *the* State court" from which it was removed (emphasis added)). The parties are, of course, free to seek transfer under Illinois' doctrine of *forum non conveniens*. *See Dawdy v. Union Pac. R.R. Co.*, 207 Ill. 2d 167, 171–72, 797 N.E.2d 687, 693 (2003) ("The [*forum non conveniens*] doctrine allows the court in which the action was filed to

17

decline jurisdiction and direct the lawsuit to an alternative forum that the court determines can better serve the convenience of the parties and the ends of justice.")

### III. Disposition and Costs

One further issue deserves mention: In its opposition brief, Mead invokes § 1447(c) and asks the court, if the motion is granted, to award costs for litigation expenses that have accrued while the case has been in federal court. Section 1447(c) reads in relevant part as follows:

> If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

28 U.S.C. § 1447(c). Section 1447(c) typically concerns costs imposed on defendants for wrongful removal. *See Garbie v. DaimlerChrysler Corp.*, 211 F.3d 407, 410 (7th Cir. 2000). That application of the statute seems to square with its plain language, which allows the court to "require payment of just costs . . . incurred as a result of the removal." 28 U.S.C. § 1447(c). The costs in this case were not incurred as a result of its removal, and Mead points to no caselaw presenting a rationale for awarding litigation costs to a party for litigation practice in a case that eventually is remanded pursuant to § 1447(e).

The absence of significant precedent aside, the court does not find that an award of costs is warranted. Broadly, "[t]he appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party . . . ." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 140 (2005). Accordingly, "[m]ost actions seeking fees under § 1447(c) are brought by a plaintiff who wanted all along to be in state court against a defendant who improperly removed." *Micrometl Corp. v. Tranzact Techs., Inc.*, 656 F.3d 467, 470 (7th Cir. 2011). An award of costs to defendants for plaintiffs' improper attempts to stay in state court is "not unheard of," *id.*, but the few cases the court could find in which costs were awarded to defendants (one dates back to 1915) all revolved around the

exposure of tactical maneuvering by the plaintiff—a situation which, the court has concluded, has not been established here. *See, e.g., Vaughan v. McArthur Bros. Co.*, 227 F. 364, 367–68 (8th Cir. 1915) (awarding costs to defendant where plaintiff spent years hiding the lack of complete diversity); *Shrader v. Legg Mason Wood Walker, Inc.*, 880 F. Supp. 366, 370 (E.D. Pa. 1995) (allowing costs to defendant where plaintiff sought to avoid removal by adding nominal, nondiverse defendant, thus seeking "some tactical advantage"); *Barraclough v. ADP Auto. Claims Servs., Inc.*, 818 F. Supp. 1310, 1313 (N.D. Cal. 1993) (awarding costs to defendant for improper maneuvering by plaintiff involving remand).

Plaintiff has pointed to an apparently legitimate claim against new defendants whose involvement in the harm sat undiscovered until recently. If ulterior motives are present, the court has not seen them.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion [73] is granted, the Medical Defendants are joined, and the case is remanded to the Circuit Court of Cook County, Illinois. A remand closing order will follow.

ENTER:

Dated: May 13, 2024

REBECCA R. PALLMEYER
United States District Judge

19